# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re:<br><br>VIJAY K. TANEJA, *et als.,*<br><br>Debtors. | Case Nos. 08-13293-RGM;(substantively consolidated into Vijay K. Taneja, 08-13293-RGM)<br><br>(Chapter 11) |

## ORDER

This case was before the court on the Final Report, Account and Joint Motion for Final Decree of H. Jason Gold, Trustee of the Liquidating Trust, and the Monitoring Committee (Docket Entry 2757). Vijay K. Taneja filed a voluntary petition in bankruptcy under chapter 11 of the Bankruptcy Code on June 9, 2008. Elite Entertainment, Inc., Financial Mortgage, Inc., NRM Investments, Inc., and Taneja Center, Inc., also filed voluntary chapter 11 petitions on the same day.[1] H. Jason Gold was appointed the chapter 11 trustee in all five cases on July 21, 2008 (Docket Entries 55 and 57). A liquidating plan was confirmed on August 10, 2011 (Docket Entry 2291).[2] The trustee filed his Final Report and his Final Account on October 10, 2014 (Docket Entry 2757).

Financial Mortgage was a mortgage brokerage firm owned by Vijay K. Taneja. He successfully and, apparently, honestly ran the business for many years. Financial Mortgage loaned money to home purchasers and then sold the mortgages to investors. In order to fund its loans to

---

[1] All five cases were substantively consolidated by the confirmation order entered on August 10, 2011 in this case. (Docket Entry 2291). They are Case Nos. 08-13286-RGM; 08-13287-RGM; 08-13290-RGM; and 08-13292-RGM, respectively.

[2] The liquidating plan transferred the remaining property of the chapter 11 estate to a liquidating trust for collection. Mr. Gold is the trustee of the liquidating trust.

homeowners, Financial Mortgage maintained lines of credit with various banks which were supposes

to be paid when the loan was sold to an investor.  At some point Taneja began to sell the same

mortgage to two or more investors, each believing that they were the holder of the note.  Taneja then

paid the defrauded investors their monthly payments, apparently sometimes replacing an existing

fraudulent loan with a new fraudulent loan.  The fraud continued until the market favorable to

perpetrating the fraud crashed during the financial crisis of 2008.

The trustee was very active.  The court's records show that the trustee filed 63 adversary

proceedings and was a party to or involved in others.  He reports that he filed 12 omnibus objections

and 24 individual objections to proofs of claims against aggregate claims of close to $200 million.

Final Report at 2, ¶1.  The trustee's counsel stated at the hearing on the Final Report that the trustee

sold about 20 properties, some with title problems arising from Taneja's fraudulent loans.  The

trustee's Final Report provides only a meager description and laconic discussion of what the trustee

did during his tenure.

The trustee received, as best the court can estimate, more than $39 million.[3]  His  Final

Account, however, is only cursory.  It states – in a conclusory manner – that the total post-

confirmation disbursements under the confirmed plan were $6,819,292.90.  This consists of post-

confirmation U.S. Trustee fees of $42,260.89; post-confirmation administrative expenses of

$2,576,994.31; post-confirmation payments to secured creditors of $3,162,373.33 which includes

a credit bid of $2,712,000.00; post-confirmation payments to priority claimants of $62,144.45; post-

---

[3]The Final Account does not state the total receipts.  It does state that the trustee had on hand "approximately $156,889.53" when he filed his Final Report.  The Final Account provides totals for categories of disbursements.  The operational expenses of the chapter 11 estate are excluded although the operation expenses for the Liquidating Trust were included.  *See* Final Report at 1 n.1; Final Account at 4.  Without considering the operational expenses of the chapter 11 estate, the court estimates that the total receipts were $42,544,870.74.

confirmation payments to general unsecured creditors of $957,354.13; and post-confirmation operating expenses of the liquidating trust of $60,426.68.

Pre-confirmation administrative expenses were $14,034,398.44, which includes U.S. Trustee fees of $144,414.54. This does not include "operational expenses incurred in the ordinary course of business." Final Account at 1 n.1 (Docket Entry 2757-1).[4]  The Final Account states that $18,185,241.11 was disbursed to secured creditors. Nothing was disbursed to priority tax claimants or general unsecured creditors pre-confirmation.

The first thing that stands out on the trustee's Final Account is the disbursements to unsecured creditors. The percentage of receipts paid to unsecured creditors is slightly more than 2.4%. The percentage of receipts paid to professionals is 42.2%. The percentage of receipts paid to secured creditors is 54.2%. The principal comparison is the comparison of disbursement to professionals  and unsecured creditors. Here the ratio is 17.35, far out of the usual range.

The second thing that stands out is the sparseness of the trustee's Final Report and his Final Account. The Final Report does not discuss the actions taken by the trustee or the properties sold. There is no disclosure of the sales prices and costs of sale of the properties sold. It is not possible to determine which sales resulted in cash to the chapter 11 estate or the amount received. There is no inventory of assets turned over to the liquidating trust. The Final Account does not account for the operational expenses of the chapter 11 estate. The Final Account does not show the total receipts. The names and amounts of the allowed  claims are not set out or the amount of the disbursements to each creditor. Much of the information is probably somewhere in the court's record. But, there are 2,764 docket entries in Taneja's case and numerous more in the other four

---

[4]  The operational expenses of the liquidating trust are disclosed on the Final Account, but the operational expenses of the chapter 11 estate are not.

cases.  It is the trustee's job to prepare a final report that enables an individual unfamiliar with the case to understand what the trustee did, all without searching the court's docket for missing information.

The last thing that stands out is the confusion created by the Monitoring Committee joining in the pleading.  It appears that the Monitoring Committee joins in the trustee's Final Report, the trustee's Final Account and the motion for a final decree.  The Final Report is the trustee's responsibility, as is the accounting.  It is difficult to see why the Monitoring Committee is a joint proponent of the Final Report and the trustee's Final Account.  While the Monitoring Committee may wish to file a pleading stating it has no objection to them, it is difficult to see why it should be a proponent.

While the magnitude of the professional fees in relation to the disbursements to the unsecured creditors is noteworthy, the mere fact that professional fees far exceed distributions to unsecured creditors does not mean that the case was not properly administered.  A trustee is charged with the duty to collect the assets of the estate.  In doing this, the trustee may be required to sell an asset or commence an adversary proceeding.  The trustee is not the guarantor of the result of a sale or an adversary proceeding.  He must make an informed decision before starting to market the property or filing a suit.  An informed decision does not mean that the trustee must have a high degree of certainty of the result.  That is too high a standard and may well discourage trustees from endeavoring to liquidate or recover an asset when the effort should be made.  A trustee needs to continually reevaluate the process and must be prepared to terminate the effort if it becomes apparent that further effort will not be cost effective for the estate.

What is to be avoided is the appearance that assets are being administered for the benefit of professionals.  Suits to recover preferences and fraudulent conveyances are important tools in ensuring the equal treatment of all creditors.  There are sound policy reasons for them.  A debtor should not be allowed to prefer friendly creditors just before filing bankruptcy and should not be allowed to hide assets by transferring them to friends or family.  Nor should creditors be allowed to coerce payments immediately before a bankruptcy and retain them to the detriment of other creditors.  Creditors, especially smaller creditors with less experience with bankruptcy, view preference litigation differently.  From their perspective, they did nothing wrong.  They completed the work contracted for and were paid – sometimes working with the debtor and accommodating the debtor's cash flow – and then are asked to give the money back, usually after it has gone into their general cash flow.  They lose money – either to an attorney to defend them or to the trustee.  It is not a happy perspective.  Overall, the policies behind preference and fraudulent conveyance litigation are justified.  The recoveries are beneficial to the entire creditor body, although not necessarily to an individual creditor.  However, preference and fraudulent conveyance litigation loses it legitimacy and its benefit to the creditor body when the lion's share of the recoveries are not paid to creditors.[5]        What is important is that the trustee's Final Report and his Final Account give a full and accurate report on his administration of the estate so that an individual who is not familiar

---

[5]There is a natural tension between the trustee seeking the recoveries and the individual creditors from whom they are sought.  The tension is captured in the title to a panel discussion at the 2014 Mid-Atlantic Bankruptcy Workshop sponsored by the American Bankruptcy Institute.  The title, Shakedown vs. The Pursuit of Justice: The Current Landscape of Avoidance Actions," is provocative but captures the tension.  Available at http://materials.abi.org/material/shakedowns-vs-the-pursuit-of-justice-the-current-landscape-of-avoidance-actions. While the title is provocative, the content of the materials is a well-balanced presentation of current developments in the area of avoidance actions.  While Mr. Gold's case, *Gold v. First Tenn. Bank N.A. (In re Tanjea),* 2014 U.S. App. LEXIS 3279 (4th Cir. Feb. 21, 2014) is included, there is no derogatory suggestion about his conduct, nor is one intended here.

with the case can readily understand what was done, why it was done and, in particular, why the

professional fees are so large in relation to the amount distributed to the unsecured creditors.

Among other questions that the trustee may wish to address are the consideration given to

converting this liquidating chapter 11 case to a chapter 7 case. More than $1.2 million was paid for

counsel to the unsecured creditors committee and $184,000 in U.S. Trustee fees. There were

additional costs for the trustee's attorneys in dealing with the creditors committee. These fees would

not have been incurred in a chapter 7 proceeding.

Several reports of sales show no proceeds to the estate and must necessarily have cost the

estate money to market and close on the properties. The trustee may wish to discuss how these sales

assisted in the administration of the estate. They may have reduced an undersecured creditor's

deficiency claim, but the Final Report is silent on the rationale for these sales. He may wish to

address whether the secured creditor obtained a benefit from the sale and the extent to which the

secured creditor assisted in paying the costs of the sale.

Protiviti was paid more than $3.4 million to reconstruct financial records, for other financial

investigations and as an expert witness. The Final Report does not address how the reports were

used, or how they advanced the trustee's litigation effort and his administration of the estate. The

trustee may wish to file Protiviti's reports (without the ledgers re-created by Proviti).

The Final Report should be written so that individuals with little knowledge of the case, such

as a creditor, a new reporter or a blogger can understand what the trustee's expectations were when

he undertook his actions, what he did, and why the case ended as it has. Upon consideration of

which it is

ORDERED that:

1.  The trustee shall file an amended final report and an amended accounting.

2.  The hearing on the Final Report, Account and Joint Motion for Final Decree of H. Jason

Gold, Trustee of the Liquidating Trust, and the Monitoring Committee (Docket Entry 2757) is

continued to January 27, 2015 at 11:00 a.m.

Alexandria, Virginia
December 11, 2014

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

H. Jason Gold
Joseph A. Guzinski


19210